**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BURNETT CONSTRUCTION COMPANY, Respondent.**

**No. 8039.**

United States Court of Appeals
Tenth Circuit.

Aug. 6, 1965.

Melvin H. Reifin, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davidson, Atty., N. L. R. B., with him on the brief), for petitioner.

Harold B. Wagner, Denver, Colo., for respondent.

Before PHILLIPS, PICKETT and LEWIS, Circuit Judges.

PICKETT, Circuit Judge.

This proceeding is here on the Board's petition for enforcement of its order directing respondent to cease and desist from its refusal to bargain, in violation of Section 8(a) (5) and (1) of the Act, and to take the necessary corrective steps. The respondent questions the Board's jurisdiction, the propriety of extending the certification year, and asserts affirmatively the good-faith basis of its refusal to bargain.

Burnett Construction Company is engaged in the ready-mix concrete business, and does some land leveling, excavating and other related construction activities, in southern Colorado. On May 21, 1963, following a consent election, the Union [1] was certified as the exclusive bargaining agent in the designated unit. The three meetings out of which the charge of refusal to bargain grew, were held on

---

1. International Union of Operating Engineers, Local No. 9, AFL-CIO.

June 20, July 30, and October 24, 1963. At the June 20th meeting the Union representatives presented Burnett (respondent's president) with a copy of a single contract and indicated that its terms were not subject to negotiation or change, and that it must be accepted as submitted. On July 30, a district representative of the Operating Engineers and the local business agent representing the Union, again met with Burnett and at that time he was given copies of four standardized union contract forms. Burnett was told, in substance, that if he would select one of the four, the Union was willing to negotiate regarding its terms.[2] No further contact was had until October 24, when representatives of both sides met at the office of respondent's attorney in Denver, Colorado. When the Union suggested at this meeting that counter-proposals be made, respondent's attorney questioned the jurisdiction of the Board and indicated that no counter-proposals or other negotiations would be made until the matter of jurisdiction was resolved. The parties stipulated that respondent's attorney, in a telephone conversation on November 4, 1963, restated their position of unwillingness to bargain until the jurisdiction question was resolved. The Board adopted the Examiner's finding that the company had committed an unfair labor practice by refusing to bargain since October 24th.

To aid in the exercise of its broad statutory jurisdiction, the Board has established certain jurisdictional standards based upon the annual volume of business and the type of establishment involved. N. L. R. B. v. Peyton Fritton Stores, Inc., 10 Cir., 336 F.2d 769, and cases cited. The standard for retail businesses was set at $500,000.00 (N. L. R. B. v. Peyton Fritton Stores, Inc., supra; Carolina Supplies & Cement Co. etc., 122 N.L.R.B. 88), and for non-retail businesses at $50,000.00, (Siemons Mailing Service, 122 N.L.R.B. 81). The Board will assert jurisdiction over enterprises doing at least the minimum amount of business per year. The record indicates that the respondent's retail business did not equal the $500,000.00 standard, but it was stipulated that during 1963 it purchased from outside the State of Colorado cement and other products having a gross value of $53,673.10. After deducting the amount of sales discounts, there remained $51,500.10 of gross purchases as the jurisdictional determinant. The respondent contends primarily that it is a retail busi-

---

2. With reference to this meeting, Mr. Blomquist, District Representative of the Union, testified as follows:

"Q. Would you state what, if anything, was said by either Mr. Burnett, yourself, or Mr. Blatnick at this meeting? A. I introduced myself to him, Mr. Gordon Burnett, and told him that I was the new fellow in District No. 3; that I had taken Bill Wallace's place, and that we brought along our agreements and left them with him; that we would sit down at any time he seen fit to negotiate any agreement; if he would pick out one that was close, or that could suit him, we would try to negotiate the agreements to our best ability. * * * Q. All right, sir. Would you continue and tell us what, if anything was said by the parties at that time? A. Well, we had a nice talk with him, and he would take a look at the agreements— Q. Who said this? You tell us who said what. A. Gordon Burnett. Gordon Burnett said he would take a look at the agreements and try to have another meeting with us and see which one we could negotiate with him with. Q. To the best of your knowledge, do you recall whether or not anything else was said at that meeting? A. The only thing he brought up was the little problem about the last bunch of fellows in their throwing the agreement on his desk— TRIAL EXAMINER: Tell us what he said. What did he say? THE WITNESS: He asked me—Gordon Burnett asked me if I had read the minutes of it, and I told him at the time I just got through reading them and in my memory, I couldn't recall all of what happened, but I knew a little bit about it, and that it wouldn't happen with me, because I would try to negotiate these agreements with him. Q. What wouldn't happen. What did he say happened, and what did you say? A. I wouldn't come along and throw the agreements on his desk and say that is it, you have to sign one of them. I wouldn't go—I don't do it that way."

# 60

ness. However, the Board found that it engaged in activities both retail and nonretail in nature. "It is well-settled Board policy that where, as here, the nonretail aspect of an employer's operation is not *de minimis*, the Board's nonretail standard will be applicable." National Car Rental Co., 141 N.L.R.B. 1086, 1087.[3] The record supports the Board's finding as to the nature of the business, and this Court cannot say that in such instances the Board applies the wrong standard. Secondly, the respondent urges that its volume of business does not meet even the nonretail standard of $50,000.00, and therefore it was an abuse of discretion to assert jurisdiction. Ambiguity in the stipulation is urged in support of this proposition. The contention is patently without merit.

 The Board's order requires the employer to "Regard the Union upon resumption of bargaining and for seven months thereafter as if the initial year following certification had not expired." The one year bargaining period following Union certification insures ample bargaining time and protects against dilatory tactics. Brooks v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125; N. L. R. B. v. U. S. Sonics Corp., 1 Cir., 312 F.2d 610. When there has been a refusal to bargain in good faith, it may be "reasonable and proper" to extend the certification year. N. L. R. B. v. Commerce Co., 5 Cir., 328 F.2d 600, 601, cert. denied 379 U.S. 817, 85 S.Ct. 32, 13 L.Ed.2d 28; Mar-Jac Poul-

try Co., Inc., 136 N.L.R.B. 785. In light of the evidentiary support of the Board's conclusion that respondent refused to bargain, it cannot be said that the extension here is unwarranted.

 Respondent asserts that its refusal to bargain was based on a good-faith doubt as to the Union representatives' ability to bind the Union because they were not properly elected. It is true that the Secretary of Labor did file suit to set aside the election of union officers held in June, 1963, and that it resulted in the vacation of the election of one officer. The possibility of an invalid union election, however, does not affect an employer's duty of good-faith bargaining. The Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 482(a) provides in part that "The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide." An erroneous view of the law, even if held in good faith, is not a defense to a charge of refusal to bargain. Old King Cole v. N. L. R. B., 6 Cir., 260 F.2d 530. Nor did the "take it or leave it" attitude on the part of the Union at the June 20 meeting absolve the employer of its duty, since the record shows the Union wholly repudiated that position at the next meeting by its tender of four contracts and offer to negotiate.

The Order of the Board will be enforced.

---

3. In Siemons Mailing Service, 122 N.L.R.B. 81, 86, the Board said: "Whether such services are regarded as direct outflow as the Employer contends, or as indirect outflow, is not here determinative. For the Board has concluded that it will best effectuate the policies of the Act if jurisdiction is asserted over all nonretail enterprises which have an *outflow or inflow across State lines of at least $50,000, whether such outflow or inflow be regarded as direct or indirect*. For the purposes of applying this standard, *direct outflow* refers to goods shipped or services furnished by the employer outside the State. *Indirect outflow* refers to sales of goods or services to users meeting any of the Board's jurisdictional standards except the indirect outflow or indirect inflow standard. *Direct inflow* refers to goods or services furnished directly to the employer from outside the State in which the employer is located. *Indirect inflow* refers to the purchase of goods or services which originated outside the employer's State but which he purchased from a seller within the State who received such goods or services from outside the State. Applying this standard, the Board will adhere to its past practice of adding direct and indirect outflow, or direct and indirect inflow. It will *not* add outflow and inflow." (Footnote omitted.)