**Tony R. SANTANGELO, doing business as Santangelo & Co., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 8456.

United States Court of Appeals Tenth Circuit.

Aug. 12, 1966.

Victoria F. Gross, Denver, Colo., for petitioner.

Warren M. Laddon, Atty., NLRB (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Atty., NLRB, on the brief), for respondent.

Before PHILLIPS, JONES* and SETH, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

This is a petition to review an order of the National Labor Relations Board. The respondent before the Board, petitioner here, was Tony R. Santangelo. Santangelo is engaged as a small wholesaler in the fruit and vegetable business in Denver, Colorado. His place of business is at 209 Denargo Market, a farmers' cooperative market located in Denver. He deals in fruits and vegetables and sells them to restaurants, small groceries, and clubs. He does not sell to individuals. Santangelo buys his produce from farmers at the market when Colorado-grown produce is available. He buys his oranges, apples and bananas primarily from large wholesalers, who purchase them in carload and truckload lots.

* Of the Fifth Circuit, sitting by designation.

He also buys other fruits and vegetables from such large wholesalers when Colorado produce is not available.

Due to the fact that the chain food markets purchase most of their fruits and vegetables from sellers other than Denver wholesalers and transport them into Denver by truck, the wholesale fruit and vegetable business in Denver is diminishing from year to year and Santangelo faces a difficult competitive situation.[1]

There was no specific evidence as to the amount of produce handled by Santangelo annually that was shipped in from outside the State of Colorado, but Santangelo testified that it was more than $50,000.

■ The evidence warranted the finding that a labor dispute which might result in a work stoppage would have an appreciable impact on interstate commerce and would tend to impede the flow thereof.[2] We agree with the Board that jurisdiction was established.

Santangelo, at the time here material, had five employees: One bookkeeper, his wife; one foreman, and three truck drivers, who also worked as warehousemen and cleaned up the dock. The truck drivers operated the delivery trucks and delivered the produce to Santangelo's customers. They were Eugene Elizolde, Manuel Del Real and Alfonso Sisneros.

In January, 1965, a brother-in-law of Elizolde, Florenzio Evangelista, was a member of Local 452 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, and was engaging in soliciting members for Local 452. He succeeded in obtaining membership cards signed by Elizolde and Del Real while they were eating breakfast at the Denargo Market on the morning of January 7, 1965. He obtained a signed membership card from Sisneros during the afternoon of that day and after Sisneros had completed his work for the day. After Evangelista had secured the first two cards, he told Elizolde and Del Real that he only needed one more card. He told Sisneros that everybody else had signed.

The cards were delivered to the local union and on January 8, 1965, Sutton, a representative of the local union, called on Santangelo and delivered to him a letter dated January 8, 1965, which stated that the union had been authorized by all employees of Santangelo, exclusive of clerical employees and supervisors, to represent them in all matters pertaining to their hours of work and other terms and conditions of employment, exhibited the originals of the three cards, and gave Santangelo photostatic copies of such cards. The letter requested Santangelo to meet with the union as bargaining agent on Monday, January 11, 1965. Santangelo stated to the union representative that his employees had not said anything to him about wanting to join the union, and that he would let the union know later. On the afternoon of January 8, 1965, after the delivery men had picked up their pay checks at the office, a conversation took place between Santangelo and the three delivery men. Santangelo asked the delivery men if they had signed the cards and they replied in the affirmative. He told them how he had almost joined a union when he was a truck driver, but at the last minute decided not to join, because he did not approve of something the union wanted to do. No details were stated. He told them that he could put meters on the trucks and in that event they would have to run on a strict schedule and would have to account for all their time. He mentioned the fact that the delivery men on occasions came to work a few minutes late. He mentioned garnishments. Eli-

1.  At one time, there were 300 farmers selling produce at the Denargo market. At the time of the hearing, the number was approximately 35.

2.  NLRB v. Conover Motor Co., 10 Cir., 192 F.2d 779, 781; NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 226, 227, 83 S.Ct. 312, 9 L.Ed.2d 279; NLRB v. Burnett Construction Co., 10 Cir., 350 F.2d 57, 59, 60; NLRB v. Central Oklahoma Milk Producers Ass'n, 10 Cir., 285 F.2d 495, 496.

zolde had had two garnishments. He mentioned a traffic accident. Sisneros had been involved in three truck accidents with his delivery truck. Santangelo stated he had nothing against the union. He further stated that the drivers were going to receive an increase in wages. The raise was granted about January 29, 1965, which was approximately six months from the time each of the drivers began working for Santangelo. They were hired for a sort of probationary period and were told that if they did their work they would get a raise in six months. Santangelo did not directly request them to get their cards back or to withdraw from the union, but he told them they ought "to think it over."

Del Real, called as witness by the General Counsel, testified that he signed the card, because he understood Sisneros and Elizolde were going to sign and that he did not want to stand in their way; that after discussing the matter with Santangelo, the three delivery men came to an agreement that they would not join the union, because Santangelo "didn't want us to"; that they then went across the street to ask for the return of their cards and found the union office was closed. Del Real further testified that he did not want to remain in the union for the reason "I just wasn't interested."

Sisneros, called as a witness for Santangelo, testified that he signed the cards, because he was told that Del Real and Elizolde had signed the cards and he didn't want to stand in their way; that he didn't want to remain in the union, because when he was on another job he was out of work during a strike and couldn't pay his bills; and by reason of that experience he did not care to belong to the union. He stated that Mrs. Gross

had represented him in other matters and that he went to her to find out how to withdraw from the union, and that as a result she prepared a letter dated January 12, 1965, which stated in effect that Sisneros and Del Real desired to withdraw from the union and cancel authorization for union representation. It was signed by Mrs. Gross, as their attorney, and by Sisneros and Del Real personally.

There can be no doubt that Santangelo discussed with his three employees, who had signed the cards, the possibility of putting meters on the trucks, the fact that they had been late without being docked, that they had had garnishments and accidents, and that they were due for a raise in the near future, at the end of approximately six months of employment.

The Hearing Examiner found that the statements of Santangelo to his employees, after they had stated that they had signed the cards, with respect to meters, accountability for tardiness in reporting for work, garnishments, and accidents, in their context were a "thinly veiled coercion," since it was directly indicated and implied that stricter and more adverse working conditions could or would result if the employees persisted in their union adherence, and that the promise and granting of a wage increase had as its purpose and effect the granting of a material benefit in return for the employees' abandonment of the union.

■■ The issues of fact and the inferences to be drawn from the facts adduced in evidence are matters for the determination of the Board.[3] We cannot say on a consideration of the entire record that the factual conclusions of the Hearing Examiner adopted by the Board were erroneous.[4]

The order will be enforced.

3. NLRB v. Nevada Consolidated Copper Corp., 316 U.S. 105, 106, 107, 62 S.Ct. 960, 86 L.Ed. 1305; NLRB v. Beatrice Foods Co., 10 Cir., 183 F.2d 726, 727, 728.

4. NLRB v. Beatrice Foods Co., supra, at 727; 29 U.S.C.A. § 160(e).