**CANNADY et al., d/b/a, Bob White Target Co., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CANNADY et al., d/b/a, Bob White Target Co., Respondent.**

**Nos. 71–1532, 71–1657.**

United States Court of Appeals, Tenth Circuit.

Aug. 14, 1972.

Rehearing Denied Sept. 25, 1972.

James G. Baker, Kansas City, Mo. (Harry L. Browne and James R. Willard, Kansas City, Mo., on the brief), for petitioner Cannady and others, d/b/a Bob White Target Co.

Alan Cirker, N.L.R.B. (Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., on the brief), for respondent N. L. R. B.

Before HILL and BARRETT, Circuit Judges, and LANGLEY,* Chief District Judge.

BARRETT, Circuit Judge.

The National Labor Relations Board entered an order on April 20, 1970 compelling Richard L. Cannady and Jane Cannady, d/b/a Bob White Target Company (Bob White), to reinstate one discharged employee and seven strikers and to pay them back wages. The Board's decision also contained an order directing that the Bob White Target Company recognize and bargain with the properly elected union. Richard and Jane Cannady, who are husband and wife, filed a petition to review to set aside the Board's order. In a cross-application, the Board prayed that its order be enforced in full. Following a thorough review of the record and the applicable law, we conclude that the Board's order must be set aside and enforcement denied.

The Bob White Target Company is a division of the Cannady Supply Company; both are co-owned by Jane and Richard Cannady. Bob White manufactures clay targets for trap shooting which are sold to various gun clubs directly as well as through the Cannady Supply Company, a retail sporting goods store. Bob White and Cannady Supply are located within two blocks of each other in Ottawa, Kansas.

The Bob White plant presses, paints, boxes and distributes clay targets. Some of the targets are painted yellow for daytime shooting. These targets do not require complete painting and can be boxed immediately after painting, without concern that they will stick one to another or break. The balance of the targets are completely painted white for night-time shooting. They must first be dried on racks. If they are boxed while wet, they stick together, thus making it difficult to separate them without breakage. Several documented complaints were received concerning wet white targets. One customer refused to purchase any more targets because of these problems.

Richard Cannady testified that on the night of April 7, 1970 he delivered some white targets to a customer who forthwith complained that the targets were wet. There was some dispute as to when the complaint was made, but this is not critical. Richard testified that when he returned home that evening he told his wife Jane of the complaint. He related to her that he felt that the person who boxed those targets should be fired. Jane testified that she then called Doris Lucas, a part-time employee, and asked her if she would like to become a full-time employee. Lucas testified (which Jane denied) that Jane also inquired of her about union activity and requested that Lucas obtain a union authorization card for Richard to see. Lucas testified that she told Jane that she could not do that.

On the morning of April 8, 1970, employee Carolee Boerman was assigned to paint white targets. Donna Meeker was instructed to box the painted targets. After several boxes had been filled, Milburn Moffett, the plant foreman, opened the boxes. He testified that the targets were extremely wet. Donna Meeker's fellow employees testified that they had checked all of those targets and that in

* Of the Eastern District of Oklahoma, sitting by designation.

their opinion they were dry enough to box. They further testified that the first white targets boxed each morning were those targets which had been painted the previous night. Jane Cannady, after hearing that Meeker had packaged the wet targets, took Meeker aside and fired her. Jane and Meeker then left the plant and went to the Cannady Supply Company to settle Meeker's pay. In the interim, the other employees of Bob White had learned of Meeker's discharge. They proceeded to the Supply Company where they protested Meeker's discharge. What then occurred is highly controversial, but essentially each employee was asked if she wished her check in full payment of services rendered to that date. All but one demanded their pay checks. Richard Cannady stated that if they accepted their pay checks they would no longer be considered employees of Bob White Company. All of the employees except one responded that they wanted their checks. The employees then left the office and proceeded to employee Boerman's home. The Cannadys thereafter attempted to encourage the employees to return to their jobs.

These events were preceded by a meeting between James Summers, a Regional Representative of the AFL–CIO, and Meeker on April 3, 1970. Summers gave Meeker some union authorization cards for the employees to sign in order to be represented by a union. On the evening of April 7, 1970, all of the employees except one had signed union authorization cards. The holdout employee signed a card the day following Meeker's discharge.

The Cannadys first challenge the jurisdiction of the Board. They allege that the two companies were separate entities. However, there was common management and interrelation of operations. For income tax purposes the operations were treated as one. The Board had jurisdiction of the dispute. National Labor Relations Board v. Frontier Guard Patrol, Inc., 399 F.2d 716 (10th Cir. 1968).

The critical issue presented involved the determination by the Examiner and the Board that employee Meeker's discharge was an unfair labor practice. The Board is charged with the burden of proving by substantial evidence that an employee's discharge was improperly motivated and that it constitutes an unfair labor practice. National Labor Relations Board v. Western Bank and Office Supply Company, 283 F.2d 603 (10th Cir. 1960); National Labor Relations Board v. Marsh Supermarkets, Inc., 327 F.2d 109 (7th Cir. 1963), cert. denied 377 U.S. 944, 84 S.Ct. 1351, 12 L.Ed.2d 307 (1964). An employee can be discharged for a good reason, a bad reason, or no reason at all where antiunion motivation has not been established by substantial evidence. National Labor Relations Board v. Meinholdt Manufacturing, Inc., 451 F.2d 737 (10th Cir. 1971); National Labor Relations Board v. O. A. Fuller Super Markets, Inc., 374 F.2d 197 (5th Cir. 1967).

Two months before Meeker was discharged, Meeker and Boerman had a conversation at work. Meeker jokingly said that with her big mouth and Boerman's brains they might be able to have a union represent them. Shortly thereafter, Jane said to Meeker that before she would have a union she would only hire patients from the local state mental hospital. The Trial Examiner held that Jane's expressed animus is significant in appraising her later conduct. This isolated statement by Jane, standing alone, is not sufficient to show the requisite bias toward unions.

On April 7, Jane Cannady talked to Lucas on the telephone. Jane asked her if there had been any union activity at the plant. Jane observed that she had heard about some cards floating around. Lucas responded that she was unaware of a union although she had signed an authorization card. Jane then offered Lucas a full-time job with Bob White. Lucas accepted. Jane then asked Lucas to obtain a sample card. The Board found that this "interrogation" was coercive in nature and vio-

lated Section 8(a) (1) of the Act. We disagree. Not all interrogations are illegal. To violate the Act the interrogation must interfere with, restrain or coerce the employees. Hughes & Hatcher, Inc. v. National Labor Relations Board, 393 F.2d 557 (6th Cir. 1968). The Board has failed to meet its burden of proof in its contention that the interrogation by Jane interfered with the free exercise of Lucas' rights.

■■ The next morning Jane granted Lucas permission to bring her child to the plant. She said Lucas would not be able to do this if there was a union. The Board found that Jane's remark constituted an unlawful interference, prohibited by the Act because it made Lucas fear unionization and threatened the loss of a privilege. However, where employers' remarks do not contain threats, but are predictions and prophecy, such remarks are protected. National Labor Relations Board v. Automotive Controls Corporation, 406 F.2d 221 (10th Cir. 1969). In light of the circumstances, we hold that Jane's remarks were not coercive.

■■ The signal act of discharge of an employee raises no presumption of an unlawful purpose standing alone. Bituminous Material & Supply Co. v. National Labor Relations Board, 281 F.2d 365 (8th Cir. 1960). In the record before us there is virtually no evidence tending to show that Meeker's involvement with union activity was known to either Jane or Richard Cannady. The evidence is simply insufficient to support the Examiner and the Board in the finding that Meeker was discharged because of her union activity. National Labor Relations Board v. Rickel Bros., Inc., 290 F. 2d 611 (3rd Cir. 1961).

■ When the employees learned of Meeker's discharge they went to the company office where they then refused to return to work. They demanded their accumulated pay when they were told that Donna Meeker would not be reinstated. They were then engaged in a concerted activity. National Labor Relations Board v. Holcombe, 325 F.2d 508 (5th Cir. 1963); National Labor Relations Board v. New England Tank Industries, Inc., 302 F.2d 273 (1st Cir. 1962), cert. denied 371 U.S. 875, 83 S.Ct. 147, 9 L.Ed.2d 114 (1962). The employees left their jobs in protest over the lawful discharge of Meeker. Under these circumstances, they were economic strikers subject to permanent replacement. National Labor Relations Board v. J. Mitchko, Inc., 284 F.2d 573 (3rd Cir. 1960); National Labor Relations Board v. John S. Swift Company, 277 F.2d 641 (7th Cir. 1960); National Labor Relations Board v. Robinson, 251 F. 2d 639 (6th Cir. 1958). The striking employees through Doris Lucas phoned Jane Cannady on the afternoon of April 8, 1970, several hours after they had left the Cannady Supply Company office. All of the striking employees were present, together with Eugene Ewing, a union field representative. Doris Lucas asked Jane to permit all of the employees to return to work, including Meeker. Jane Cannady responded that all would be reinstated except for Meeker. The striking employees made it clear that they would not return unless Meeker was reinstated. After replacements were hired the Cannadys sent letters to the employees offering to place them on a preferential hiring list when positions became available. This conduct, notwithstanding the Cannadys' obvious concern relating to union activity, flies in the face of the "animus" found by the Examiner and the Board in light of the fact that the offer was made with knowledge by the Cannadys that each employee offered preferential hiring had signed an authorization card. Even this offer was rejected unless Meeker be reinstated. Since the employees would not return without Meeker they were terminated when permanent replacements were hired.

■ The Board's ruling that there was a violation of Section 8(a) (3) and (1) of the N.L.R.A.[1] was premised on

---

1. National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

the proposition that Meeker's discharge was unlawful and that the other employees were Unfair Labor Practice Strikers, whose rights were protected under the Act. The evidence does not support this conclusion. If Richard Cannady's statement to the employees to the effect that if they picked up their checks they were through is interpreted as a final and absolute discharge of the employees, then, as the Board argues, their termination was an unfair labor practice. Under such interpretation they are entitled to reinstatement with back pay. But we hold that they were not terminated until they were replaced. Our case is analogous to National Labor Relations Board v. European Cars Ypsilanti, Inc., 324 F.2d 606 (6th Cir. 1963). There the employer sent letters accompanied by pay checks to striking employees who were protesting an employee's discharge. The letters stated that since they had not reported for work, they had voluntarily quit. The Court held that the employer's efforts to encourage the employees to return to work negated the charge that the striking employees had been discharged. The same reasoning applies to this case. We hold that the Bob White employees were similarly not discharged by the single act of acceptance of their pay checks.

■ Although not presented as an issue in the complaint, the Examiner and the Board nevertheless found that the Union had the support of the majority of the employees. A bargaining order was issued by the Board under Section 8(a) (5) of the Act. We hold that inasmuch as Meeker was lawfully discharged on the morning of April 8, 1970, and that the other employees were lawfully terminated when they were replaced later that day, the bargaining order is of no force or effect.

Enforcement of the Board's order is denied.