NATIONAL LABOR RELATIONS
BOARD, Petitioner-Appellant,

v.

ALBION CORPORATION, d/b/a Brooks,
Inc., Respondent-Appellee.

No. 77–1424.

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 28, 1978.

Decided March 5, 1979.

Howard F. Fine, Washington, D. C. (William R. Stewart and David A. Fleischer, Attys., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., with him on the brief), for petitioner-appellant.

David R. Gorsuch, Denver, Colo. (James A. Jablonski, Denver, Colo., with him on the brief) for respondent-appellee.

Before SETH, Chief Judge, and LEWIS and BARRETT, Circuit Judges.

LEWIS, Circuit Judge.

The National Labor Relations Board (Board) has petitioned for enforcement of its order issued against Albion Corporation (Albion), and Albion has petitioned for review of that order. 29 U.S.C. § 160(e) and (f). The Board determined that Albion had engaged in unfair labor practices in violation of § 8(a)(5), (3) and (1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (the Act).

This litigation stems from a labor dispute involving the janitorial and maintenance workers at Brooks Towers, a large apartment and office complex in downtown Denver. Prior to June 1974 Brooks Towers was operated by Arapahoe Leasing Corporation, which had separate contracts with Local No. 1 of the International Union of Operating Engineers (the Union), covering the janitorial and maintenance employees. Albion was formed in June 1974 by Magna Associates, the building owner, to take over management operations after Arapahoe became financially unable to continue. Arapahoe assigned to Albion its rights under its agreements with Magna and with the tenants. Albion retained the maintenance and janitorial employees as well as Gary Thomas, the building manager. Thomas had sole authority to hire and fire maintenance and janitorial employees and set their rates of pay.

Shortly after the assignment of leases to Albion, Thomas executed a contract in the name of Arapahoe with the Union covering the maintenance employees which was effective through June 14, 1975. Later, in October of 1974, Thomas on behalf of Albion, executed a contract with the Union covering the janitorial employees, effective January 1, 1974 through December 31, 1975.

On April 10, 1975,[1] the Union sent Thomas a notice of its intent to reopen the maintenance employees contract and enclosed a list of proposed changes. Receiving no response, the Union Business Manager Sam Crouch called Thomas several times in May. Thomas finally told Crouch that he would not be handling the negotiations, and Thomas was subsequently terminated about June 1. In early June, Thomas' secretary informed Crouch that Albion Vice-President Howard Torgove would handle the negotiations. Crouch called Torgove on June 9 and was told to contact Hubert Weinshienk, Albion's attorney. On June 11, Crouch, accompanied by Charles Hoffman, a maintenance employee and shop steward, met with Weinshienk at the latter's office. Weinshienk said that he was not familiar with labor law, and that he regretted the presence of Hoffman, since Weinshienk had only met to get information, not to bargain. Weinshienk further stated that Albion would not bargain until the existence of its bargaining obligation was established. Crouch referred Weinshienk to Mark Simons, the Union's attorney.

The next day, June 12, Weinshienk and Simons discussed Albion's bargaining obligation, but Weinshienk did not become convinced that an obligation existed until he completed his legal research on Saturday, June 14. Meanwhile, on June 12, the maintenance employees voted unanimously to strike on Monday, June 16. On June 15 Torgove spoke with Union Steward Charles Hoffman. The testimony of the two men as to the substance of the conversation conflicted, but the Board credited Hoffman, who testified that Torgove asked him to delay the strike for two weeks but refused to meet with Union Manager Crouch as a condition of getting the strike postponed. When Hoffman telephoned Torgove later that day and confirmed that the strike was still on, Torgove replied that anyone who picketed Albion would never work there again.

On June 16, all eight maintenance employees went on strike, and the ten janitorial workers honored their picket. Albion hired temporary independent contractors to fill in during the strike. On the first day of the strike, Weinshienk called Simons and informed him that Albion was willing to bargain, but was preparing a petition to the Board for an election to determine the Union's majority status. Weinshienk said that Torgove had told him that one employee had expressed dissatisfaction with his representation by the Union.

On June 20 Simons and Weinshienk scheduled a bargaining meeting for the following week, and Simons offered unconditionally to have all the employees return to work. Albion did not respond to this offer until June 27, when, at a meeting between the Union and Albion representatives, Albion Attorney David Gorsuch said that the janitors could be reinstated, but the maintenance employees could not return to work until some unspecified "legal questions" were answered. At a later meeting, on July 2, Albion took the position that if the janitors returned to work they must guarantee to remain at work for 30 to 60 days. Albion subsequently changed its terms by requiring a flat 60 day commitment from the janitors.

Albion continued to bargain with the maintenance workers through July and early August. Albion proposed new contract terms which would have entailed wage and benefit reductions for the maintenance workers, but which were still higher than the wages being paid the replacements, and which other maintenance workers at comparable buildings were then earning. On August 8, Albion made its "final offer" to the maintenance employees, and when it was not accepted the replacements were offered permanent employment. The striking maintenance workers were never reinstated, but the janitors were reinstated in October.

Charges of unfair labor practices were filed with the Board, which found that Albion had:

---

1. Unless otherwise indicated, all dates hereafter are in 1975.

1. Violated § 8(a)(1) of the Act by telling its employees that anyone who went on strike would never work for Albion again;

2. Violated § 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union; and

3. Violated § 8(a)(3) and (1) of the Act by refusing to reinstate the maintenance workers at their prestrike pay rate and refusing to reinstate the janitorial employees without a commitment by them not to strike for 60 days.

The Board accordingly ordered Albion to refrain from interfering with the employee's rights, to bargain with the Union upon request, and to offer reinstatement to the maintenance employees together with lost earnings for both maintenance and janitorial workers.

The function of this Court in reviewing decisions of the Board is narrowly circumscribed. The standard of review is not whether we

> would have arrived at the same result as the Board did, but whether the Board's findings were "supported by substantial evidence on the record considered as a whole." *N.L.R.B. v. Pipefitters,* 429 U.S. 507, 531, 97 S.Ct. 891, 905, 51 L.Ed.2d 1.

### I.

■ The Board ruled that Torgove's purported statement to Hoffman that any employee who went on strike would never again work for Albion gave rise to a violation of § 8(a)(1) of the Act.[2] This finding is amply supported by the record. It is true that Torgove denied making the statement, but the Board was justified in crediting Hoffman's account of the conversation. *N.L.R.B. v. Okla-Inn,* 10 Cir., 488 F.2d 498.

■ Torgove's assertedly benign subsequent conduct in no way vitiated the legal import of his threat. Indeed, if later conduct could be found to rebut the unlawfulness of an employer's anti-union threats, employers would be free to threaten and intimidate their employees at will in anti-union efforts, so long as the employer's "bark" was worse than his "bite." Section 8(a)(1) is intended to protect employees in their union activities from even the idle threat of retaliation. *See N.L.R.B. v. King Radio Corp.,* 10 Cir., 416 F.2d 569, 572–73, cert. denied, 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420; *Betts Baking Co. v. N.L.R.B.,* 10 Cir., 380 F.2d 199.

The Board's finding is further supported by evidence of anti-union motivation on the part of Torgove. When Hoffman suggested that the strike could be postponed if Torgove were to speak with the Union, Torgove reportedly answered that "he wouldn't talk to Sam Crouch or anybody else from the Union." There was sufficient evidence of Union animus in this emphatic reply to support a finding of a § 8(a)(1) violation even if Torgove's threat had only slight impact on the employees. *N.L.R.B. v. Great Dane Trailers,* 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027.

### II.

■ The Board's finding that Albion refused to bargain with the Union in violation of § 8(a)(5)[3] and (1) of the Act is also adequately supported by the record. The Board concedes that Albion's outright refusal to bargain lasted only five days, from June 11 to 16. While the time was short, the refusal came at a critical period just prior to the expiration of the contract and in the face of a threatened strike. It is no excuse that the refusal to bargain was caused by uncertainty on the part of Albion as to the existence of a bargaining obligation. *N.L.R.B. v. Burnett Construction Co.,* 10 Cir., 350 F.2d 57, 60.

---

**2.** § 8(a)(1) provides:

  (a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title. 29 U.S.C. § 158(a)(1).

**3.** § 8(a)(5) provides:

  (a) It shall be an unfair labor practice for an employer—(5) to refuse to bargain collectively with the representatives of his employees . . . .. 29 U.S.C. § 158(a)(5).

■ The Board, however, did not rely entirely on the events of June 11–16 in finding a § 8(a)(5) violation. It also considered Albion's dilatory behavior in response to the Union's overtures beginning with the letter of April 10. While the complaint only alleged failure to bargain since June 11, conduct prior to that time may properly be considered to elucidate the "true character" of the events occurring during the period alleged. *See Machinists Local v. Labor Board*, 362 U.S. 411, 416, 80 S.Ct. 822, 4 L.Ed.2d 832. The Board was therefore justified in concluding that the refusal to bargain was part of a continuous course of conduct in violation of the Act.

### III.

■ The record likewise supports the finding of the Board that Albion imposed unlawful conditions on the reinstatement of unfair labor strikers in violation of § 8(a)(3)[4] and (1) of the Act. The Board urges, and we agree, that our decision in *N.L.R.B. v. Wichita Television Corp.*, 10 Cir., 277 F.2d 579, *cert. denied*, 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 93 controls. We there held that:

> Striking employees are upon request entitled to reinstatement if unfair labor practices are the cause or one of the operative causes of their strike. 277 F.2d at 584.

Substantial evidence on this record indicates that the June 16 strike was in part caused by Albion's refusal to bargain. Shortly before the June 12 strike vote was taken, Crouch informed the employees that "we had no new contract and none had been discussed." Crouch and Shop Steward Hoffman had met with Weinshienk the previous day, and the Board could reasonably infer from this statement by Crouch that the employees were aware of Albion's refusal to bargain, and that was an operative cause of the strike vote.

This inference is strengthened by Hoffman's testimony that he offered to have the strike postponed if Torgove would only *meet* with the Union. Additionally, on June 19 the Union offered to have the employees return to work at the time Albion remedied all of its unfair labor practices. An unconditional offer to return to work was in fact made the following day, although Albion had by then agreed, not to sign a contract, but only to begin bargaining. Albion's assertion that the strike was caused entirely by economic issues must therefore fail.

### IV.

In its appellate brief, Albion has requested that we remand this cause to the Board with instructions to reopen the record for the purpose of admitting additional evidence concerning Albion's good faith during negotiations with the maintenance employees. The Administrative Law Judge found, and the Board concurred, that Albion failed "at all times prior to June 16, as well as thereafter," to bargain in good faith with the Union. Reliance was placed by the Board on Weinshienk's statement that Albion intended to petition for an assertedly groundless majority status election, and on Albion's refusal to reinstate the maintenance employees at their former wage rate. Albion, to the contrary, argues that it bargained in good faith with the Union from late June until its offer of August 8 was refused, at which point impasse was reached. Albion asserts that it made a lawful unilateral change in terms of employment following this impasse in bargaining, and the decision to continue the strike beyond that point constituted revocation of the earlier unconditional offer to return to work. The strike purportedly continued thereafter purely on economic issues. Therefore, Albion urges, the award of lost pay should be limited to the period prior to the impasse in bargaining.

In support of this position, Albion moved the Board to reopen the record for the

---

**4.** § 8(a)(3) provides:

(a) It shall be an unfair labor practice for an employer—(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: . . . 29 U.S.C. § 158(a)(3).

purpose of taking newly discovered evidence. Albion made an offer of proof that it and the Union reached an agreement with respect to the Brooks Towers janitorial employees in February 1976, after the close of the hearing in this case. At negotiations with the janitorial representatives, Torgove allegedly took a bargaining position very similar to that which he displayed in negotiations with Crouch the previous summer concerning the maintenance employees. The offer of proof further states that the agreement concluded in February 1976 provides for a substantially lower economic package than that enjoyed by the janitors under the *prior contract*. The motion to reopen was denied by the Board, which stated the proffered evidence had no bearing on the question of Albion's good faith at the negotiations with the maintenance employees.[5] We do not agree.

■ Section 10(e)[6] of the Act authorizes this Court to order additional evidence taken if we, in our discretion, determine that such evidence is material, and that reasonable grounds exist for the failure to adduce such evidence in the original hearing. *Labor Board v. I. & M. Electric Co.*, 318 U.S. 9, 63 S.Ct. 394, 87 L.Ed. 579. Our review here is not subject to the same narrow constraints which apply to challenges of factual findings made by the Board, *Id.*, at 28, 63 S.Ct. 394, but we do attach weight to the Board's prior determination of non-materiality. *See N.L.R.B. v. Boyer Brothers, Inc.*, 3 Cir., 448 F.2d 555, *cert. denied*, 409 U.S. 878, 93 S.Ct. 132, 34 L.Ed.2d 132.

■ We are convinced, however, that this proffered evidence was not only essentially unavailable at the time of the hearing, but also has great bearing on the question of Albion's good faith. The offered evidence, which we assume to be true for present purposes, *N.L.R.B. v. Ideal Laundry and Dry Cleaning Co.*, 10 Cir., 330 F.2d 712, 716, demonstrates that Albion was able within a few months of the negotiations here at issue to convince the Union that its financial plight justified a wage and benefit reduction for its Brooks Towers employees. The tenacity with which Albion maintained its position and the ultimate acquiescence of the Union thereto, when considered in the light of presently existing evidence of Albion's financial dilemma strongly supports the assertion of good faith.

We would not remand to the Board if there were but a "remote possibility" that the outcome would be affected thereby. *N.L.R.B. v. Process and Pollution Control Co.*, 10 Cir., 588 F.2d 786, 1978. Given the importance of the proffered evidence, however, and the disunity of the Board's previous determination we believe that remand is justified in this instance. *See Amalgamated Meat Cutters & Butcher Workmen v. N.L.R.B.*, 136 U.S.App.D.C. 306, 420 F.2d 148; *Swinick v. N.L.R.B.*, 3 Cir., 528 F.2d 796.

We therefore enforce the order of the Board with the exception of those provisions requiring Albion to make its employees whole for loss of pay, which we remand to the Board with instructions to reopen the record for the purpose of admitting the newly discovered evidence pertaining thereto.

Enforced in part; remanded in part.

BARRETT, Circuit Judge, dissenting:

I respectfully dissent.

---

5. The General Counsel objected below to the offer of proof on the additional grounds that part of the proffered evidence occurred prior to the hearing, and the motion was not timely filed. These additional objections have not been pressed before this Court, and we deem them to have been waived by the Board, which considered the substance of the offered proof to reach the materiality issue, the sole ground on which it relied. *See* Board Rules and Regulations § 102.48(d).

6. Section 10(e) provides in pertinent part as follows:

   If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, . . . the court may order such additional evidence to be taken . . . and to be made a part of the record. 29 U.S.C. § 160(e).

I do not believe that Torgove's statement gave rise to a § 8(a)(1) violation. In his dissenting opinion Board Member Walther pertinently observed:

> Finally, I cannot agree with my colleagues that Torgove's statement to Hoffman that "anyone who picketed would never work for Respondent again" violated Section 8(a)(1) of the Act. Although such a statement would ordinarily constitute a violation of Section 8(a)(1), Respondent's subsequent conduct in offering to reinstate both janitorial and maintenance employees effectively rebutted the import of the threat. As with Respondent's other conduct discussed above, I would not divorce this single element of behavior from that which eventually transpired.
>
> [R., Vol. III, p. 532.]

I agree with Board Member Walther. Under the facts of this case, Torgove's isolated statement, if made, did not give rise to a Section 8(a)(1) violation. Assuming, *arguendo*, that Torgove made such a statement, even so, the conduct complained of could have had only a comparatively slight impact on employee rights. Intent thus becomes an important issue in determining whether an employer has committed an unfair labor practice. Under such circumstances, there must be subjective evidence of anti-union motivation in order to find that an employer has committed a violation. *National Labor Relations Board v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *Johns-Manville Products Corporation v. National Labor Relations Board*, 557 F.2d 1126 (5th Cir. 1977); *Cannady v. National Labor Relations Board*, 466 F.2d 583 (10th Cir. 1972).

At the time of Torgove's alleged statement on June 15, 1975, he was one of 50 owners of Albion and his ownership interest was two-thirds of 1 per cent. Torgove was personally employed on a full-time basis as a commercial real estate salesman. He was not involved in commercial building management or experienced in union-management affairs. Torgove first received notice of a union contract on June 9, 1975 and his alleged statement was made less than a

week later when Albion's attorney was still uncertain whether Albion was obligated to negotiate. On Thursday, June 12, 1975 Torgove had been assured by several key employees that the union, which was aware of Albion's financial plight, would work with Albion and that it would not strike; furthermore, on June 16, 1975, Albion reiterated its commitment to negotiate and bargain with union, because at that time it had decided it was obligated to do so. Inasmuch as Albion was willing to initiate negotiations the day after the alleged statement was made, and because there is no evidence indicating that the alleged statement was motivated by union animus, I would hold that a § 8(a)(1) violation did not occur. Three days prior to the day the alleged statement was made, Torgove had called all of the key people together and related, *inter alia*, that: Albion had terminated the previous building manager; he knew very little about the building and he was asking "for their greater help because we would need it in order to survive the next couple months"; and that the building was losing money and had lost money. Torgove was in a harried, vexed position. He was making every effort to salvage a business venture which he had a small interest in. His comments, if made, were certainly inopportune. Even so, I would view them as expressions of Torgove's apprehension over the maintenance employees striking at a critical period, considering that three days prior thereto he had been assured of the union's desire to work with Albion.

I am also unable to accept the majority opinion's endorsement of the Board's holding that Albion unlawfully refused to bargain with union in violation of § 8(a)(5) and 8(a)(1) of the Act.

The factual framework of the instant case does not warrant the Board's holding that even though Albion's refusal to bargain lasted only five days, the record nevertheless establishes a continuous course of such conduct. On the contrary, I would hold that the record evidences that Albion's actions did not give rise to a refusal to bargain in good faith. The Board's deter-

mination that Albion committed a § 8(a)(5) violation does not meet the substantial evidence test when we consider: Albion was first *informed* of the contract on June 9; Albion first *saw* the contract on June 11; Albion indicated its *readiness* to bargain on June 16; and Albion had at all times indicated its *willingness* to negotiate and bargain if it determined that it was bound by the improperly executed contract of its predecessor. The Board's finding that Albion violated § 8(a)(5) under the facts presented herein is clearly arbitrary and capricious.

I am also unable to accept the majority's position that Albion imposed unlawful conditions on the reinstatement of the strikers, when the record is devoid of any evidence that the maintenance workers went on strike in protest of unfair labor practices. This is apparent, I believe, in light of the facts that Albion was first contacted by the union on June 9, 1975; Albion first met with union on June 11, 1975, and then saw the contract for the first time; and the next day, June 12, 1975, the maintenance employees voted to strike. As of June 12, 1975, Albion was yet attempting to digest the contract it had received only the day before. As of June 12, 1975, Albion's attorney had but one opportunity to discuss Albion's position with union's attorney. Also, as of June 12, 1975, the only affirmative statement Albion had made to union relative to negotiations and bargaining was that if it determined that it was bound by the Arapahoe contract, it would enter into collective bargaining with union.

Board asserts that the employees were aware that Albion was refusing to bargain when Crouch told them they had no new contract and none had been discussed. Board cannot pile inference upon inference in making such a case. Albion had not seen the contract before June 11, 1975. Crouch spoke to the employees the very next day. The dissenting opinion of Board Member Walther sets forth, in my view, the reason for the strike:

> I must also dissent from my colleagues' conclusion that the June 16 strike was an

unfair labor practice strike, a conclusion I find to be completely unwarranted by the facts. The sole evidence of the maintenance employees' motivation for striking consists of statements by Union Steward Hoffman and employee Larry Mitchell. Hoffman testified that the maintenance employees voted on June 12 that "if [the maintenance employees] didn't have a contract when the collective-bargaining agreement expired [they] would go out on strike." Mitchell's statement describing what happened at the strike vote meeting is as follows:

> Sam [Crouch] was our Union man. He met us there, and informed us that as of that date, we had a contract that would expire Saturday night at midnight, and we had no new contract and none had been discussed, and it was up to the men in the maintenance myself to decide whether we would strike or not.

> This relatively sparse evidence concerning the maintenance and janitorial employees' motivation for striking belies any inference that the strike was provoked or caused by Respondent's alleged refusal to bargain. There is absolutely no evidence that the union membership was even made aware of Attorney Weinshienk's June 11 postponement, much less that this factor played a part in motivating the strike vote. Rather, the facts clearly establish that the union membership voted to strike for a reason which customarily impels unions to strike—that is, because they had no contract—not because Respondent had not yet commenced bargaining.

[R., Vol. III, pp. 528–529.]

I would hold that the Board was clearly erroneous in finding and/or concluding that the strike was the result of an unfair labor practice committed by Albion. In my view, Albion had legitimate, sound business reasons to restrict the conditions relating to the employees' return to work. These reasons included Albion's perilous financial position, the show of potential violence on the picket line, and the sabotage that had occurred in the building. Here, then, Albion

established that its refusal to unconditionally reinstate the employees was predicated on "legitimate and substantial business justification" enunciated in *National Labor Relations Board v. Fleetwood Trailer Co.*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967) and "economic justification" recognized by this court in *M. S. P. Industries, Inc. v. National Labor Relations Board*, 568 F.2d 166 (10th Cir. 1977).

I would deny enforcement of the Board's order. In my view, Albion proceeded in good faith at all times.