PENNYPOWER SHOPPING NEWS,
INC., Petitioner and
Cross-Respondent,

v.

The NATIONAL LABOR RELATIONS
BOARD, Respondent and
Cross-Petitioner.

No. 80–2213.

United States Court of Appeals,
Tenth Circuit.

Jan. 25, 1984.

William H. Dye, Wichita, Kan. (Larry G. Rapp and Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., of counsel and on brief), for petitioner and cross-respondent.

Richard Michael Fischl, Miami, Fla. (Vivian A. Miller and Robert W. Smith, Washington, D.C. (William Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., on brief), for respondent and cross-petitioner.

Before HOLLOWAY, McWILLIAMS and BARRETT, Circuit Judges.

HOLLOWAY, Circuit Judge.

This is a petition by Pennypower Shopping News, Inc. to review and set aside an order of the National Labor Relations Board. 253 N.L.R.B. 85 (1980). The Board makes cross-application to have its order enforced. The principal question before us is whether substantial evidence on the record as a whole supports the Board's finding that Pennypower violated § 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1) (1976), by causing nine of its employees reasonably to believe that they had been discharged, or at

least that their employment status was questionable because of their activity in a strike, or conditioned on their abandonment of the strike.

## I.

Pennypower is engaged in the production and distribution of a weekly shopping newspaper. On the evening of Friday, January 6, 1978, a group of eleven employees from Pennypower's Art Service and Printing Division presented Production Manager Walter Hern with a list of grievances concerning wages and other conditions of employment, and identified their action as a "walkout." I.R. 24, 30–31, 210. Employee Kristina Achterman advised Hern that the strikers would meet with him the following monday to discuss their grievances. *Id.* at 367.

On Monday afternoon, January 9, a group of employees who had walked out the previous Friday appeared at Hern's office. *Id.* at 25, 596. Employee Jonna Leisek announced to Hern, "We are here to talk," to which Hern responded, "Your final checks will be mailed to you shortly." *Id.* at 370. When Leisek asked if this meant that the protestors were "fired," Hern answered, "It is my understanding that eleven people left their jobs Friday night." At 370-71. The employees told Hern that they had not quit, and continued to question him about their job status. *Id.* at 163, 372. Hern denied that he had "fired anybody," but repeatedly stated that he assumed that all eleven protesters would be "replaced." *Id.* at 73, 390, 396. When asked to explain his statements, Hern responded, "I have left jobs before and to me that means you leave." *Id.* at 390–91. In response to other questions from employees, Hern stated that he did not know the answers. *Id.* at 41, 57, 394.

As the employees began to depart, Hern stated, "If you have any personal items at your desk, you may get them now." *Id.* at 377. After leaving Hern's office, most of the employees went directly to the state unemployment office to ascertain their employment status. *Id.* at 57, 222–23.

Based on the foregoing facts the Board, with one member dissenting, and in disagreement with the Administrative Law Judge, found that Pennypower had violated § 8(a)(1) of the Act. The ALJ found that "[o]verall, this configuration of facts harmonizes fully with my finding that no reasonable basis existed for 'the strikers' to believe they were discharged or could not readily acquire 'reinstatement' (to repeat the Board's terms)." III R. 600. The Board, however, found that from the employees' view

> Hern's remarks and responses throughout the meeting created a climate of ambiguity and confusion which reasonably caused the employees to believe that they had been discharged or, at the very least, that their employment status was questionable because of their strike activity. Having created the ambiguity, and having failed to clarify it, the burden of the results of that ambiguity must fall on Respondent. The inference stemming from those results is clear, and we draw it, that Respondent engaged in such conduct as a device to break the strike by creating the impression either that the employees had been discharged because of their strike activity, or that their employment status was conditioned on their abandonment of the strike. In these circumstances, and contrary to the intimation of the Administrative Law Judge, Respondent's offer to reinstate Mondy and Harris, who sought an interview with Walton, does not equate the failure of others to seek a similar interview with an intention to quit. Accordingly, we find that Respondent caused the employees reasonably to believe that they had been discharged, or that their continued employment status was questionable, because of their participation in protected concerted activity, in violation of Section 8(a)(1) of the Act. We further find that, having been placed in that position by Respondent, the employees were under no obligation to seek reinstatement, and we shall order their reinstatement.

III R. 605–06 (footnote with citation omitted). Board Member Penello dissented, agreeing with the views of the ALJ.

The Board ordered Pennypower to cease and desist from the unfair labor practice found, and from in any like or related manner interfering with, restraining, or coercing employees in the exercise of rights guaranteed them by § 7 of the Act. The Board also ordered Pennypower to offer the nine discharged employees immediate and full reinstatement with backpay, and to post appropriate notices.

## II.

█ The Board's factual findings are entitled to acceptance by a reviewing court so long as they are supported by substantial evidence in the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The standard of review is not altered simply because the administrative law judge and the Board have reached contrary conclusions. *U.S. Soil Conditioning v. NLRB,* 606 F.2d 940, 945 (10th Cir.1979). We must still start with the findings made by the Board and accept them if they are supported by substantial evidence. *NLRB v. Pacific Grinding Wheel Co.,* 572 F.2d 1343, 1347 (9th Cir.1978).

█ There is no dispute that the Pennypower employees, in protesting their wage rates and other employment conditions, were engaged in protected strike activity within the meaning of the Act. *See NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 15, 82 S.Ct. 1099, 1103, 8 L.Ed.2d 298 (1962). The question presented is whether Pennypower committed an unfair labor practice by causing the employees reasonably to believe they were discharged, or that their employment status was questionable because of their protected concerted activity or conditioned on their abandonment of the strike. The test of whether an employee has been discharged depends on the reasonable inferences that the *employee* could draw from the statements or conduct of the employer. *NLRB v. Central Oklahoma Milk Producers Association,* 285 F.2d 495, 498 (10th Cir.1960); *accord, Liberty Mutual Insurance Co. v. NLRB,* 592 F.2d 595, 604 (1st Cir.1979); *NLRB v. Hale Manufacturing Co.,* 570 F.2d 705, 708 (8th Cir. 1978); *NLRB v. Cement Masons Local No. 555,* 225 F.2d 168, 172 (9th Cir.1955); *C.J. Krehbiel Co.,* 227 N.L.R.B. 383, 384 (1976), *enforced,* 593 F.2d 262 (6th Cir.1979). The fact of discharge does not depend on formal words or procedures. *NLRB v. Central Oklahoma Milk Producers Association,* 285 F.2d at 497–98.

█ In this case, there is substantial evidence in the record as a whole to support the Board's findings that the company's actions caused the employees reasonably to believe that they had been discharged, or that their continued employment status was questionable, because of their participation in the strike and that the employees had been placed in that position by the company. III R. 605–06. Production Manager Hern's initial statement at the January 9 afternoon meeting was that the employees' "final checks will be mailed to you shortly ..." I R. 370.[1] Thereafter, Hern told the employees that he assumed that all eleven workers who had walked out on January 6 would be replaced, and he concluded by saying that the employees could remove any personal belongings from their desks. Although Hern told the employees that he had not "fired anybody," it is evident that his other remarks supported different inferences. When the employees confronted him with persistent questions about their employment status, Hern stated his assumption that all the strikers would be replaced, likened a walkout to a permanent departure, or else stated he did not know the answers.

█ Understandably, such conduct created a climate of ambiguity and confu-

---

**1.** The Board found that employees Mondy and Harris did not attend the afternoon meeting on January 9 in Hern's office. The Board, however, included them in its general findings concerning the unfair labor practice committed and we feel that the record as a whole supports the Board's disposition as to all nine employees.

sion. The fact that there is no formal discharge is immaterial if the words or conduct of an employer would logically lead an employee to believe his tenure has been terminated. *See NLRB v. Central Oklahoma Milk Producers Association,* 285 F.2d at 497–98; *NLRB v. Comfort, Inc.,* 365 F.2d 867, 875 (8th Cir.1966). Moreover, we accept the Board's view that since the company created the ambiguity which reasonably caused the employees to believe they were discharged, or at least to believe their employment status was questionable due to their strike activity, the burden of the ambiguity must fall on the company. III R. 605; *see Conair Corp.,* 261 N.L.R.B. 1189, 1190 (1982). We also find sufficient support in the record, considered as a whole, for the inference the Board drew that the company engaged in such conduct as a device to break the strike by creating the impression either that the employees had been discharged because of their strike activity, or that their employment status was conditioned on their abandonment of the strike. III R. 606. We are convinced that it was not error for the Board to conclude, based on reasonable inferences it drew, that there was a violation of the § 8(a)(1) provision that it is an unlawful labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7," which include concerted activities.

Our conclusion is not altered by the company's reinstatement of two other employees or by its invitation for individual interviews with the strikers. Although an employer's efforts to encourage employees to return to work may negate the inference of a discharge, *see Cannady v. NLRB,* 466 F.2d 583, 588 (10th Cir.1972), we accept the Board's contrary conclusion here that the company created ambiguity and confusion, causing the employees reasonably to believe that they were discharged because of their strike activity, or at least that their employment status was questionable or conditioned on their abandonment of the strike. III R. 605–06.

We reject the contention that the Board erred by failing to follow its prior decision in *Pink Supply Corp.,* 249 N.L.R.B. 674 (1980). In *Pink Supply,* the employees may have been in some doubt as to their employment status, but there was no basis in the credited evidence for charging the employer with any heavier responsibility for the uncertainty than was attributable to the employees themselves. *Id.* at 674. When the employer asked the employees whether they were quitting, the employees' spokesman volunteered that the employees would come in to clean out their desks, and they did so the next day. In these circumstances the Board found that it was unreasonable for the employees to believe that they had been discharged. In contrast, the record here shows repeated denials by the employees that they intended to quit. It is also abundantly clear here that the suggestion that the employees clean out their desks was initiated by the company, and not by the employees themselves. Accordingly we find the *Pink Supply* case distinguishable.

While this case is close and the divergence of views between the Board and the ALJ has caused us to have concern, we are not convinced that the inferences drawn by the Board are not fairly supported by the record, considered as a whole. Accordingly, the petition for review will be denied and the Board's order will be enforced.

BARRETT, Circuit Judge, dissenting:

I recognize our narrow scope of review. Even in this light, the majority opinion states, and I agree, that the case is "close."

It is my view that the Board, in ruling that Pennypower violated § 8(a)(1) of the Act by causing the subject employees to believe that they had been discharged, employed impermissible boot-strapped inferences. The NLRB concluded, without the benefit of substantial evidence, that Hern's "ambiguous" responses to some of the employees' questions led them to believe they had been discharged. This conclusion smacks headlong against the decisions of two Administrative Law Judges, made independently following evidentiary hearings

that no reasonable basis existed for the strikers to believe that they had been discharged or could not readily acquire reinstatement.

The first hearing was held before ALJ Blackburn who died after a full evidentiary hearing but before he could rule on the motion to dismiss the complaint. Administrative Law Judge Ricci was appointed as the Board's ALJ. He rendered his decision dismissing the Board's complaint based on his review of the record and briefs. The Board rejected his decision, particularly because it was not predicated on specific credibility findings. The matter was remanded for a *de novo* hearing before ALJ Heilburn. He conducted a *de novo* evidentiary hearing and rendered specific findings of fact, based upon credibility determinations. He concluded that no reasonable basis existed for the strikers to believe that they were discharged or could not readily acquire reinstatement. These specific findings were rejected by the Board which did not have the advantage of making credibility assessments. The Board's use of inferences should not prevail over the specific credibility determinations of ALJ Heilburn. I would deny enforcement of the Board's order.