Filed 3/1/22  Wonderful Orchards v. Agricultural Labor Relations Board CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| WONDERFUL ORCHARDS LLC,<br><br>Petitioner,<br><br>v.<br><br>AGRICULTURAL LABOR RELATIONS BOARD,<br><br>Respondent;<br><br>IMELDA VAZQUEZ-LOZANO,<br><br>Real Party in Interest. | F081172<br><br>**(46 ALRB No. 2)**<br><br><br><br>**OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of review.  Mary Miller Cracraft, Administrative Law Judge.

Roll Law Group and Kristen E. Bass; Barsamian & Moody, Ronald H. Barsamian and Patrick S. Moody for Petitioner.

Santiago Avila-Gomez, Todd M. Ratshin and Scott P. Inciardi for Respondent.

No appearance for Real Party in Interest.

-ooOoo-

In this writ proceeding, Wonderful Orchards (Wonderful) seeks review of a decision and order of the Agricultural Labor Relations Board (ALRB or Board). The Board found Wonderful had engaged in an unfair labor practice and ordered remedies for that practice. We affirm the Board's decision and order.

## FACTUAL BACKGROUND

### A. Wonderful and the Van Crew

Wonderful is an agricultural employer that grows pomegranates and nuts in the San Joaquin Valley. The events at issue in this case occurred in December 2016 at Wonderful in Kings County where pomegranate trees were being weeded by agricultural workers.

On December 27 and 28, 2016, Wonderful hired eight workers, including charging party Imelda Vazquez-Lozano, through a farm labor contractor, Family Ranch, to weed pomegranate trees—an activity that involves cutting down weeds around the trees with hoes—at its Kings County orchard. Vazquez-Lozano drove a van to transport herself and the other seven workers (collectively, the van crew) to and from the orchard.

Family Ranch employee, Alicia Prudencio, was the foreperson supervising the van crew at the orchard, as well as other workers engaged in weeding alongside the van crew. Jacinto Alavez was Prudencio's supervisor.

### B. Members of the Van Crew Complained About Working Conditions; Prudencio Told the Van Crew Workers That If They Did Not Want to Work, They Could Leave

The van crew worked a full shift at the orchard on December 27, 2016. However, on that day, Prudencio indicated that some of the van crew workers were not keeping up with the requisite pace of work and asked Vazquez-Lozano to help them keep up.

The van crew reported for their second day of work on December 28, 2016. Early in the shift, the pace of work again became an issue. Vazquez-Lozano and another member of the van crew, Dominga Hernandez Ortuno (Hernandez), both testified at the hearing (before an administrative law judge (ALJ)) held in this matter, that Prudencio

2.

repeatedly pressured the van crew to work faster. The respective testimony of Vazquez-Lozano and Hernandez on this point was credited by the ALJ.

According to Vazquez-Lozano, the van crew included older workers who could not keep the pace that Prudencio was demanding. Hernandez testified that her "back was hurting a lot," which was also preventing her from keeping up with the faster workers. Vazquez-Lozano testified that at least one other worker was similarly experiencing lower back pain. The other crews working alongside the van crew were composed of younger workers who were able to work faster.[1]

Hernandez was concerned about the pressure to work faster and told Vazquez-Lozano that she could not go as fast as was expected. Hernandez testified that Vazquez-Lozano raised the issue with Prudencio. Vazquez-Lozano testified she told Prudencio, " 'Alicia, you can't be rushing the people that much.' " Vazquez-Lozano brought various concerns to Prudencio's attention in this context, including the fact that Vazquez-Lozano "had two people with [her] who [were] … older" and that some workers were experiencing back pain. Hernandez testified that she also told Prudencio, after the latter had sharpened Hernandez's hoe, that, even with the sharpened hoe, it was not possible to work as fast as Prudencio was demanding.[2] Prudencio did not let up on the pressure.

Eventually, about two hours into the shift, Prudencio halted the van crew's work and called a meeting with the crew. Brenda Torres, a safety and/or registration employee for Family Ranch, Wonderful's farm labor contractor, was also nearby at the time. Prudencio repeated her demand that the van crew must work faster; she said her own

[1] Both Vazquez-Lozano and Hernandez also noted that the hoes given to the van crew were not sharp; although the hoes were sharpened after the workers raised the issue with Prudencio, Vazquez-Lozano explained the edges could be expected to become dull again as the day progressed and Hernandez complained to Prudencio that, even with a sharpened hoe, she could not keep the pace Prudencio was demanding.

[2] Hernandez initially indicated she had this discussion with Prudencio on the first day of work but then clarified that she was referring to the "last day" of work, that is December 28, 2016.

3.

supervisor was pressuring her to increase the pace of the work to make it more economical for the company. Vazquez-Lozano, who was aware that older members of her crew were unable to work faster and who had discussed the issue with at least one crew member (Hernandez), again objected that Prudencio could not expect the same pace from older workers as she could from younger ones. Prudencio stated that if the van crew did not want to work, they should put down their hoes and leave.[3] At this point, Vazquez-Lozano and the rest of the van crew began to leave. Prudencio did not say or do anything to stop them.

## C. The Van Crew Departed the Orchard Without Any Intervention By Prudencio; On Their Way Out, Vazquez-Lozano Told the Crew Not to Sign Any Timesheets Because They Were Fired

As the van crew made their way towards their van, an individual named Crystal or Chris approached the van crew. Crystal/Chris asked the van crew to sign timesheets so they could be paid for the hours they had worked. Vazquez-Lozano, however, told the van crew not to sign anything. She testified, "I told everyone not to sign it because it seemed unfair to me that [Prudencio] was kicking us out like that. And if we signed it, it's almost as if we were telling them that we were leaving voluntarily." Hernandez confirmed that Vazquez-Lozano "did say for us not to sign, that we had been fired and we should leave." The ALJ credited the respective testimony of Vazquez-Lozano and Hernandez on this issue. Prudencio and Torres also testified, respectively, that each heard Vazquez-Lozano tell the crew not to sign the time sheets (the implication of which statement was that the crew was not leaving voluntarily). Nonetheless, Prudencio did not intervene or otherwise address the van crew's situation and departure.

---

[3] Prudencio denied making this statement and contended that she had merely asked if the crew "could, please, as a favor, cut [the weeds] down shorter," whereupon Vazquez-Lozano abruptly threw down her hoe and told the crew to leave with her. The ALJ discredited Prudencio's testimony as to the progression of events, as well as Torres's similar testimony.

4.

After the van crew had reached and boarded their van, Torres approached and asked Vazquez-Lozano to wait and talk to her. Vazquez-Lozano initially declined to speak to Torres. However, subsequently she got out of the van and spoke to Torres. Vazquez-Lozano asked Torres for the telephone number for the Labor Commissioner or the "farmworker union." Torres responded she did not have the requested telephone numbers; Torres did not address the van crew's employment status.[4] The van crew thereafter departed.

Vazquez-Lozano filed a charge with the ALRB the same day, alleging that she and her coworkers were unlawfully terminated for complaining about working conditions.

**D.    Vazquez-Lozano Had a Conversation with Jacinto Alavez (Prudencio's Supervisor) the Following Day; Alavez Offered to Return the Crew to Work, but the Crew Had Already Found Other Employment**

The next day, December 29, 2016, Alavez spoke with Vazquez-Lozano on the telephone. Alavez offered the van crew work starting the following day, under a different foreperson. Vazquez-Lozano declined the offer, stating she and her crew had already found new jobs, which offered higher pay. Alavez also asked Vazquez-Lozano why she had left work at the Wonderful orchard. Vazquez-Lozano answered that Prudencio was "rushing people and she's harassing people" and that she was "very demanding."

## PROCEDURAL HISTORY

**A.    The Charge, the Pleadings, and the Hearing**

Vazquez-Lozano filed the underlying unfair labor practice charge with the ALRB's Visalia regional office on December 28, 2016 – the same day that the van crew left the Wonderful orchard – alleging that she and her coworkers were terminated after complaining about working conditions. The ALRB's General Counsel issued a

---

**4**    Torres's testimony about this event differed from Vazquez-Lozano's testimony; the ALJ credited Vazquez-Lozano's version of events. The ALJ also discredited Torres's testimony, which was not corroborated by Prudencio, that Prudencio told the van crew, " 'No one's being fired.' "

complaint on December 26, 2018, alleging in relevant part that Wonderful violated Labor Code section 1153, subdivision (a), by terminating the van crew in retaliation for protected activity. Wonderful denied liability in an answer filed on January 24, 2019. The parties attended a prehearing conference with the ALJ during which they reached stipulations as to some of the facts relevant to the case. A one-day hearing was held on June 4, 2019. The General Counsel and Wonderful filed post-hearing briefs on July 12, 2019.

## B. The ALJ's Decision

The ALJ issued her decision on September 12, 2019. The ALJ framed the question before her as follows: "At issue in this proceeding is whether Charging Party Imelda Vazquez-Lozano … and her seven ride-share coworkers … were unlawfully discharged on December 28, 2016 because of their protected concerted activity, as the General Counsel claims, or whether they voluntarily quit, as Wonderful Orchards, LLC … claims." (Fns. omitted.) The ALJ also noted: "All parties were afforded full opportunity to present witnesses and exhibits and to examine and cross-examine witnesses." The ALJ further indicated that she made her findings of fact and conclusions of law "[o]n the record, as a whole, and after thorough consideration of briefs filed by the parties."

With respect to conflicting testimony presented at the hearing concerning the departure of the van crew, the ALJ credited the respective testimony of Vazquez-Lozano and Hernandez and discredited that of Prudencio and Torres (see fn. 3, *ante*). The ALJ found it "inexplicable" that the van crew would have departed, giving up most of a day's pay, if Prudencio had merely asked them "as a favor" to cut the weeds closer to the ground. The ALJ also discredited Torres's claim that Prudencio had stated that the van crew was not being terminated, noting that Prudencio herself did not claim to have made any such statement (see fn. 4, *ante*). The ALJ generally credited Vazquez-Lozano and Hernandez, finding both witnesses to be "thoughtful and clear" and their testimony

6.

"consistent and plausible." She observed that neither witness claimed that Prudencio explicitly stated they were fired, although it would have been in their interest to advance such a claim.

The ALJ found Prudencio had repeatedly exhorted the van crew to work faster and the members of the crew, including Vazquez-Lozano and Hernandez, objected to this. The ALJ found the complaints constituted protected activity and that, in response, Prudencio told the van crew that "if [they] didn't want to work [they] should just put down [their] hoes and leave," which statement would reasonably be viewed by an employee as discharge of the entire van crew; the discharge was a "mass discharge" because the van crew "rode together and had no way home except to leave with Vazquez-Lozano." The ALJ noted that, in light of the timing of these events, a causal connection between the concerns raised about the required pace of work and the discharge of the van crew "could not be clearer."

The ALJ concluded that "by the mass discharge of the van crew, [Wonderful] retaliated against the workers due to their protected concerted activity," and thus violated section 1153, subdivision (a) of the Agricultural Labor Relations Act (ALRA), which prohibits unfair labor practices, including interference with or coercion of agricultural employees with respect to exercise of various rights, including the right to engage in concerted activity (see below).[5] (See Lab. Code, §§ 1153, subd. (a), 1152.)

The ALJ recommended various remedies, including a cease and desist order; rescinding of the discharges; backpay; and posting, reading, and mailing of notices.

## C. Wonderful's Exceptions to the ALJ's Decision and Recommended Order, and the Board's Subsequent Decision and Order

Wonderful filed 19 exceptions to the ALJ's decision/recommended order and a supporting brief. Wonderful took exception to various factual findings and credibility determinations made by the ALJ. Wonderful also excepted to the ALJ's conclusions that

---

[5] The ALRA is codified at Labor Code section 1140 et seq.

the van crew was terminated and that there was a causal connection between the protected activity and the discharge. Finally, Wonderful excepted to the noticing remedies recommended by the ALJ.

The Board denied Wonderful's exceptions and upheld the ALJ's decision that Wonderful had engaged in an unfair labor practice under the ALRA by retaliating against or disciplining the van crew for protected concerted activity. The Board found that Wonderful had presented no basis to overturn the ALJ's credibility determinations. The Board agreed with the ALJ that the van crew reasonably believed under the circumstances that Prudencio was terminating them. Furthermore, the Board noted the situation created by Prudencio's "work or leave" statement was, at the very least, ambiguous, and Wonderful did not meet its burden to clarify the situation. The Board upheld the ALJ's recommended remedy with some modifications.

## DISCUSSION

### Standard of Review

"When reviewing questions of fact, we uphold the Board's findings if supported by substantial evidence on the record considered as a whole. [Citations.] Under this standard: '[W]e do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so.' [Citations.] 'Furthermore, those findings and conclusions that are within the Board's realm of expertise are entitled to special deference. [Citation.] And, because the evaluation of witnesses' credibility is a matter particularly for the trier of fact, the Board's findings based on the credibility of witnesses will not be disturbed unless the testimony is "incredible or inherently improbable." ' " (*Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2018) 23 Cal.App.5th 1129, 1162 (*Gerawan*); see Lab. Code, § 1160.8 (subsequent undesignated statutory citations are to the Labor Code).) " 'The standard of review is met … if there is relevant evidence in the record

8.

which a reasonable mind might accept in support of the findings.' " (*Gerawan*, *supra*, at p. 1162.)

"Our review is not limited to the question of whether substantial evidence supported the Board's decision. We may also consider whether an error of law was made and whether the decision was procedurally sound. [Citation.] Board decisions that rest on 'erroneous legal foundations' will be set aside. [Citation.] Such an error of law would include the Board's failure to apply the correct legal standard. [Citation.] We review all such questions of law de novo." (*Gerawan*, *supra*, 23 Cal.App.5th at p. 1163.)

"However, the ALRB's interpretation of its own regulations is entitled to deference. [Citation.] Further, as the agency entrusted with the enforcement of the [Agricultural Labor Relations Act] (ARLA) [citation], the ALRB's interpretation of this act 'is to be accorded "great respect by the courts and will be followed if not clearly erroneous." ' " (*Artesia Dairy v. Agricultural Labor Relations Bd*. (2008) 168 Cal.App.4th 598, 605 (*Artesia*).)

"As to our review of *remedies* granted by the Board, we are guided by several core principles …. Generally speaking, because the Board has broad discretion to fashion remedies to effectuate the purposes of the ALRA, courts take a cautious approach and will interfere only where the remedy is patently unreasonable under the statute [citation], or where the remedy seeks to achieve ends other than those which can fairly be said to effectuate the policies of the ALRA." (*Gerawan*, *supra*, 23 Cal.App.5th at pp. 1163-1164.)

"Under section 1148, the ALRB must follow all applicable precedents of the National Labor Relations Act (NLRA). Thus, when reviewing ALRB orders, [appellate courts are] also guided by decisions under the NLRA."[6] (*Artesia*, *supra*, 168 Cal.App.4th at p. 605.)

---

**6** The NLRA is codified at 29 U.S.C. § 151 et seq.

9.

## I. The Board's Conclusion that Vazquez-Lozano and the Van Crew Engaged in Protected Concerted Activity

Wonderful argues the Board's conclusion that Vazquez-Lozano and the van crew engaged in protected concerted activity is both unsupported by substantial evidence and legally erroneous.

Under section 1152, agricultural employees have the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." The task of defining the scope of protected activity under the ALRA " 'is for the Board to perform in the first instance as it considers the wide variety of cases that come before it' [citation] … and, on an issue that implicates its expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference." (*NLRB v. City Disposal Systems, Inc*. (1984) 465 U.S. 822, 829; *Stephens Media, LLC v. NLRB* (D.C. Cir. 2012) 677 F.3d 1241, 1250 [" 'The Board's determination that an employee has engaged in protected concerted activity is entitled to considerable deference if it is reasonable.' "].)

Aside from union activity, agricultural employee activity is protected by section 1152 when it is both concerted and engaged in for the purpose of " 'mutual aid or protection.' " (*Fresh & Easy Neighborhood Market, Inc*. (2014) 361 NLRB 151, 152-153; *Sandhu Brothers Poultry and Farming* (2014) 40 ALRB No. 12, pp. 16-19.) Activity is concerted if it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." (*Meyers Industries, Inc*. (1984) 268 NLRB 493, 497, revd. sub. nom. *Prill v. NLRB* (D.C. Cir. 1985) 755 F.2d 941, on remand *Meyers Industries, Inc*. (1986) 281 NLRB 882, affd. sub. nom. *Prill v. NLRB* (D.C. Cir. 1987) 835 F.2d 1481.) "The concept of 'mutual aid or protection' focuses on the *goal* of concerted activity; chiefly, whether the employee or employees involved are seeking to 'improve terms and conditions of employment or otherwise improve their lot as employees.' " (*Fresh & Easy Neighborhood Market, Inc*., *supra*, 361 NLRB at p. 153.)

The Board's counsel point out that, here, "Wonderful presented no argument before the Board that the ALJ's conclusion that members of the van crew engaged in protected concerted activity was incorrect," and contended "only that the ALJ erred by finding that the van crew was terminated." The Board's counsel further note that, having failed to "argue its protected activity theory before the Board," Wonderful "may not raise it for the first time before this court." (Unnecessary capitalization omitted.) We agree with the Board's counsel that Wonderful has waived its challenges, on appeal, to the Board's finding that Vazquez-Lozano and the van crew engaged in protected concerted activity with regard to complaints made to Prudencio about the pace of work required of the van crew, on December 28, 2016.

A "[p]etitioner's failure to present [an] issue to the board precludes judicial review since [the] petitioner failed thereby to exhaust its administrative remedies." (*Butte View Farms v. Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 971.) Thus, a party's failure to argue an issue before the Board waives that issue and the party is barred from raising it in a subsequent judicial review proceeding. (See, e.g., *George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1985) 40 Cal.3d 654, 661-662 (*Arakelian*) ["the requirement of exhaustion of administrative remedies is jurisdictional"]; *Nish Noroian Farms v. Agricultural Labor Relations Bd.* (1984) 35 Cal.3d 726, 737; *Rivcom Corp. v. Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756, fn. 6; see also *NLRB v. Legacy Health Sys.* (9th Cir. 2011) 662 F.3d 1124, 1126 ["In the absence of 'extraordinary circumstances,' [the] court does not have jurisdiction to hear arguments that were not urged before the Board."]; *Sever v. NLRB* (9th Cir. 2000) 231 F.3d 1156, 1171 [employee waived argument by not asserting it in exceptions to the ALJ's decision]; *NLRB v. Inter. Assn. of Bridge, Structural, Ornamental & Reinforced Iron Workers Union, Local 378* (9th Cir. 1973) 473 F.2d 816, 817 (per curiam) [party must object with specificity to preserve issue for judicial review]; *Woelke & Romero Framing, Inc. v. NLRB* (1982) 456 U.S. 645, 665-666.)

11.

Here, Wonderful noted in its first exception that Vazquez-Lozano and Hernandez "offered inconsistent testimony as to whether or not they voiced any concerns about pace to Prudencio." In addition, in its third exception, Wonderful objected to the ALJ's finding that Prudencio testified that the entire van crew objected to the faster pace. However, as reflected in its brief supporting its exceptions, Wonderful did not argue that the ALJ erred in concluding that Vazquez-Lozano had engaged in protected concerted activity, but rather challenged the ALJ's conclusion that the van crew workers were in fact *discharged*.[7]

The Board's decision and order expressly noted that Wonderful had failed to offer "any argument or authority" to challenge the ALJ's conclusion that Vazquez-Lozano and the van crew had engaged in protected activity. Citing its prior decision in *Tri-Fanucchi Farms* (2014) 40 ALRB No. 4, page 9, for the proposition that a party waives objection where an exception is unsupported by argument or authority, the Board concluded that Wonderful had waived any challenge to the ALJ's conclusion in this regard. Having reviewed the record on this point, we similarly conclude Wonderful did not adequately present to the Board, a challenge to the ALJ's conclusion that Vazquez-Lozano and the van crew had engaged in protected, concerted activity in complaining to Prudencio about pace of work required of the van crew. Wonderful has therefore waived, for purposes of appeal, its various instant challenges to the Board's adoption of the ALJ's conclusion in this regard.

Wonderful asserts that it would have been futile for it to "argue [this] issue to the Board." However, Wonderful's reliance on a putative "futility" exception is unavailing given the conclusory discussion in its briefs of any potential application of this exception here. (See *Arakelian*, *supra*, 40 Cal.3d at pp. 662-663.)

---

[7] Indeed, in objecting to the remedies recommended by the ALJ, Wonderful appeared to concede that Vazquez-Lozano had engaged in protected concerted activity, stating, "it is enough to say that if Vazquez-Lozano's activity is protected, it is barely protected."

12.

## II. The Board's Conclusion that Wonderful Terminated the Van Crew

Wonderful argues the Board's finding that the van crew was discharged is not supported by substantial evidence and is also legally erroneous. We disagree.

### A. Framework Within Which the Board Assesses Discharge Questions

As noted by the Board's counsel, when the parties dispute whether an employee was involuntarily discharged, the issue is necessarily fact driven. However, the legal framework within which the Board assesses discharge questions is well established. Under this framework, the occurrence of a discharge " 'does not depend on the use of formal words of firing.' " (*Ridgeway Trucking Co.* (1979) 243 NLRB 1048; *Smith Packing, Inc.* (2020) 46 ALRB No. 3, p. 8-9 ["It is not necessary for the employer to use any 'magic words' or to state explicitly an employee is 'fired,' 'terminated,' or 'discharged.' "].) Rather, a discharge occurs when "an employer's conduct or words would reasonably cause employees to believe that they were discharged." (*P&M Vanderpoel Dairy* (2014) 40 ALRB No. 8, p. 21; *H&R Gunland Ranches, Inc.* (2013) 39 ALRB No. 21, pp. 6-7, fn. 3; *Ridgeway Trucking Co.*, *supra*, 243 NLRB 1048, 1048.) The analysis focuses on the perspective of the employee, not the employer, and whether the employee reasonably believed that a termination had occurred. (*Dole Farming, Inc.* (1996) 22 ALRB No. 8, pp. 2-3, fn. 3; *Pennypower Shopping News, Inc.* (1980) 253 NLRB 85, enfd. sub. nom. *Pennypower Shopping News, Inc. v. NLRB* (10th Cir. 1984) 726 F.2d 626, 629.)

In instances involving ambiguity as to whether employees were fired or quit, to the extent "the employer's acts created a climate of ambiguity and confusion which reasonably caused [employees] to believe that they had been discharged or, at the very least, that their employment status was questionable," the "burden of the results of that ambiguity must fall on the employer." (*Dole Farming, Inc.*, *supra*, 22 ALRB No. 8, p. 2, fn. 3; *Pennypower Shopping News, Inc. v. NLRB*, *supra*, 726 F.2d at p. 630 ["we accept the Board's view that since the company created the ambiguity which reasonably caused

the employees to believe they were discharged, or at least to believe their employment status was questionable … the burden of the ambiguity must fall on the company"].) Thus, where an employer's conduct created ambiguity that caused employees to reasonably believe their employment status was in question or they had been terminated, the employer has a duty to clarify the ambiguity; absent such clarification, the ambiguity regarding employment status militates against the employer. (*H&R Gunlund Ranches*, *supra*, 39 ALRB No. 21, p. 5, fn. 3 ["A discharge occurs if an employer's conduct or words would reasonably cause employees to believe that they were discharged and in such circumstances it is incumbent upon the employer to clarify its intent."]; *P&M Vanderpoel Dairy*, *supra*, 40 ALRB No. 8., p. 30 [same].)

**B.      The Board's Conclusion that Vazquez-Lozano and the Van Crew Reasonably Believed They Had Been Terminated is Supported by Substantial Evidence**

The ultimate issue in the administrative proceeding, as the ALJ summed it up, was whether Vazquez-Lozano and the van crew "were unlawfully discharged on December 28, 2016 because of their protected concerted activity as the General Counsel claims, or whether they voluntarily quit, as Wonderful Orchards, LLC … claims." (Fn. omitted.) The Board, in agreement with the ALJ, found that Vazquez-Lozano and the van crew reasonably believed they had been terminated when Prudencio told them that if they did not want to work, they should put down their tools and leave. Wonderful contends the latter finding is not supported by substantial evidence.

The ALJ discredited the testimony of Wonderful's witnesses, Alicia Prudencio and Brenda Torres, regarding the circumstances surrounding the van crew's departure from Wonderful's orchard on the day in question. The ALJ noted: "Prudencio's denial that she told the van crew they should leave is contextually inexplicable. According to Prudencio, the van crew left after she asked them, 'as a favor,' to cut the weeds shorter. In fact, both Prudencio and Torres testified that after Prudencio instructed the van crew and others to cut the weeds shorter, Vazquez-Lozano said, 'Let's go.' Then the van crew

14.

threw down their tools and left." The ALJ found: "It makes no sense that after driving to a jobsite, the van crew would forego a full day's pay after being asked to cut the weeds shorter. Prudencio acknowledged that the van crew wanted to work more slowly. Her testimony that the van crew left after being told to cut the weeds shorter 'as a favor' is discredited as implausible."

The ALJ credited the testimony of Vazquez-Lozano and Hernandez about Prudencio's demands for faster work, the workers' distress at the required pace, and Hernandez and Vazquez-Lozano's objections to these demands. The ALJ found that Prudencio eventually called a meeting at which she admonished the van crew to work faster, whereupon Vazquez-Lozano again objected to the pace-related demands. The ALJ found that Prudencio then "told the van crew if they did not want to work, they should put down their tools and leave." The ALJ concluded that such words "would reasonably be viewed by an employee as discharge of the van crew."

The Board adopted the ALJ's findings. The Board noted that the pace of work was an issue throughout the time the van crew worked on weeding the pomegranate trees on December 28, 2016. The Board also noted: "Approximately two hours into the workday, Prudencio stopped work and called an impromptu meeting of the van crew. [Torres,] a Family Ranch safety employee, was also nearby. Prudencio complained again that they needed to work faster. Vazquez-Lozano again objected on behalf of the crew, telling Prudencio that she could not expect the same pace of work from older workers as she did from younger ones. Prudencio then stated that if they did not want to work, they should put down their tools and leave. At this, Vazquez-Lozano and the rest of the van crew began to leave. Prudencio did not take any action to prevent this." (Fn. omitted.) The Board further noted: "We find no basis to disturb the ALJ's decision to credit the testimony of Vazquez-Lozano and Hernandez concerning [Prudencio's work or leave] statement over the account given by [Wonderful's] witnesses that the van crew abruptly left after Prudencio politely asked them to weed closer to the ground." Finally, the Board

15.

noted: "As the crew was leaving, an individual named 'Crystal' or 'Chris' … approached the crew in order to get them to sign their timesheets. Vazquez-Lozano told the crew not to sign anything because it was unfair that Prudencio was 'kicking us out like that … [a]nd if we signed it, it's almost as if we were telling them that we were leaving voluntarily.' The record supports the conclusion that this statement was made and heard by both Prudencio and Torres."

The Board concluded: "We agree with the ALJ's conclusion that a termination occurred. We note that there was no testimony that anyone on the crew refused to work or threatened to refuse to work. Vazquez-Lozano had merely objected that the crew could not physically maintain the increased pace demanded by Prudencio. It was Prudencio who halted the work and, in response to the continued objections to her exhortations to work faster, stated that if the crew did not want to work, they should leave. Given that it had already been explained that, due to the presence of the older workers, the faster pace could not be achieved, a reasonable employee would construe Prudencio's statement as a termination."

We conclude the Board's relevant factual findings and conclusion that a termination occurred are supported by substantial evidence in the record. We reject Wonderful's argument that the Board's finding that Prudencio made the above-mentioned work or leave statement is not supported by substantial evidence. Both Vazquez-Lozano and Hernandez testified that this statement was made and the ALJ credited their testimony. Wonderful argues their respective testimony should have been discarded because Vazquez-Lozano and Hernandez were not consistent in recalling Prudencio's precise words. However, their respective accounts of the "work or leave" statement were substantially consistent. Vazquez-Lozano testified Prudencio stated words to the effect, "if we didn't want to work, that we should just leave," while Hernandez testified, "[Prudencio] said if we didn't want to work, that we should just leave, that we should – should not be there." Vazquez-Lozano testified that Prudencio *additionally* said,

16.

" 'Okay, just drop the hoes and you can leave.' " In other words, Vazquez-Lozano testified Prudencio initially made the work or leave statement, then followed it up with a more explicit directive to leave.[8] Thus, Vazquez-Lozano's testimony was not inconsistent with Hernandez's testimony, nor was it internally inconsistent.

Wonderful also argues that its witnesses' denials that the "work or leave" statement was made should have been credited. However, the Board properly upheld the ALJ's assessment that the testimony of Wonderful's witnesses on this point was not credible, noting the implausibility of Prudencio's account that a very polite request to "please, as a favor, cut [the weeds] down shorter" prompted the van crew to abruptly abandon their work and forego most of a day's pay. Furthermore, Prudencio's claim that the height of the weeds, rather than the pace of the work, was the sticking point, was undercut by her own testimony. For example, Prudencio testified that she pulled workers aside on the second day of work to speak with "the ones that were farthest behind of everybody." She also complained, with respect to the events of the second day, that the van crew was "already slower than everybody else and they wanted to work even slower than that." We see no basis to disturb the ALJ's credibility determinations adopted by the Board.

Wonderful further argues that since Vazquez-Lozano was aware Prudencio did not have the authority to unilaterally terminate employees, she could not reasonably have believed that Prudencio's "work or leave" statement amounted to a termination. We are not persuaded.

The Board found that the van crew never refused to work, rather it was Prudencio who stopped the work; the van crew was simply objecting to working conditions that they viewed as unreasonable. The Board concluded that, under these circumstances,

---

**8**     The Board found it unnecessary to determine whether the second statement was made because it concluded the van crew would reasonably have believed, on the basis of the first statement alone, that they had been terminated.

17.

Prudencio's response to the effect that the van crew could leave if they did not want to work was reasonably understood by the workers as a termination. The Board noted that its conclusion in this regard was consistent with both ALRB and NLRB precedents finding terminations in similar situations involving "work or leave" ultimatums. (See, e.g., *Ridgeway Trucking Co.*, *supra*, 243 NLRB 1048, 1049 [truckers reasonably believed they had been terminated when employer told them to get in their trucks or leave the premises]; *Teresa Coal Co., Inc.* (1981) 259 NLRB 317, 318-319 [finding termination where protesting employees were told to work or go home]; *P&M Vanderpoel Dairy*, *supra*, 40 ALRB No. 8, pp. 4-5, 21 [finding termination where employees demanding wage increase were told "if you don't want to work you can go"].)[9]

Here, Vazquez-Lozano responded affirmatively when asked, on cross-examination, whether she knew that, as a general matter, Prudencio did "not have the ability to fire people at Wonderful Orchards." However, Prudencio testified that she had the authority to recommend to her supervisor that particular employees be terminated. In this context, it is significant that Prudencio told the van crew that she was in communication with her supervisor, and he was unhappy with the slow pace of work and had directed her to increase it. Thus, when Prudencio told the van crew that if they did

_____

[9] The Board's decision was also consistent with ALRB and NLRB precedents establishing that employees may not be required to abandon their protected activity as a condition of remaining employed. (*Smith Packing, Inc.*, *supra*, 46 ALRB No. 3, pp. 9-10; *Datwyler Rubber and Plastics, Inc.* (2007) 350 NLRB 669, 676 [employer violated NLRA by discharging employee who complained on behalf of others about mandatory Sunday work]; *Kolkka Tables & Finnish American Saunas* (2001) 335 NLRB 844, 847 ["it was reasonable for the 15 employees who chose not to abandon their concerted protest to believe that their choice meant they were discharged for engaging in protected concerted activity, i.e., for continuing their concerted protest and failing to 'get back to work or go home' "].) The Board could properly find, as it did, that the van crew had not refused to work, and that the implication of Prudencio's work or leave ultimatum, from the workers' perspective, was that should the crew continue to protest the required pace of work, they would be deemed to not want to work and would be required to leave. In other words, Prudencio's ultimatum conveyed the message that the van crew could either drop their complaints about the required pace of work or leave the worksite.

not want to work as required they could leave, the crew could reasonably believe that Prudencio was authorized by her supervisor to enforce the pace requirements on pain of termination. Furthermore, as the Board noted, Torres, whom Vazquez-Lozano regarded as a supervisory figure, was present for the entire incident and did not countermand Prudencio's "work or leave" statement, thereby further indicating the termination was authorized by management.

### C. The Board's Conclusions That It Was Incumbent On Wonderful To Clarify Any Ambiguity Concerning the Van Crew's Employment Status and That Wonderful Failed To Do So, Are Supported By Substantial Evidence and Are Not Legally Erroneous

As discussed above, the Board concluded that, under the applicable circumstances, the van crew reasonably construed Prudencio's "work or leave" statement as a discharge. The Board further noted, in this context: "[Wonderful argues] that the ALJ failed to consider its efforts to clarify that the van crew was not terminated. However, Prudencio's direction to work or leave was, at the very least, ambiguous and we find that subsequent events, far from clarifying that the van crew was not terminated, would have confirmed the initial impression created by Prudencio that a termination had occurred." The Board explained that both Prudencio and Torres heard Vazquez-Lozano tell the van crew not to sign any timesheets (Prudencio and Torres testified as much); although Vazquez-Lozano's statement to this effect indicated the van crew was not leaving voluntarily, neither Prudencio, nor Torres, told the van crew that they were not terminated.

Wonderful argues that the Board improperly placed the burden of clarifying any ambiguity as to the van crew's employment status on Wonderful, on the basis that Wonderful created an atmosphere of confusion about the crew's status. According to Wonderful, it was Vazquez-Lozano who created the confusion by unilaterally walking her crew off the job.

First, Wonderful's position is premised on testimony that was discredited by the ALJ, specifically the respective testimony of Prudencio and Torres that Vazquez-Lozano

19.

abruptly told her crew to leave after Prudencio politely asked them "as a favor" to cut the weeds shorter. As discussed above, the Board properly upheld the ALJ's credibility determinations in this context, rendering Wonderful's argument unavailing.

Moreover, in light of the Board's factual findings, it could properly conclude that Prudencio's conduct rendered the van crew's status, at a minimum, ambiguous. Notwithstanding the van crew's objections to Prudencio's exhortations to work faster, there was no evidence that anyone on the van crew suggested leaving the worksite. Even when Prudencio stopped the van crew's work in order to press them to work faster, no member of the crew proposed leaving or threatened to leave. The situation changed only once Prudencio articulated the "work or leave" ultimatum in the face of the crew's complaints about the required pace of work. Immediately after Prudencio made this statement, the van crew began to depart, and Vazquez-Lozano noted the crew was being unfairly fired. Thus, the Board's conclusion that Prudencio caused the confusion over the crew's status is supported by substantial evidence. (*Pennypower Shopping News, Inc. v. NLRB, supra*, 726 F.2d at p. 630.) As discussed above, the law provides that when an employer's actions create confusion or ambiguity regarding an employee's employment status, the employer has a duty to clarify the situation. The Board, therefore, did not improperly shift the legal burden in this respect to Wonderful.

Wonderful also challenges the Board's conclusion that Wonderful failed to clarify the ambiguity it had caused as to the van crew's employment status, and argues the Board improperly minimized evidence regarding attempts by Torres to clarify the status of the van crew. We conclude the Board properly considered the relevant evidence, and further, that the Board's conclusion that Wonderful failed to clarify the ambiguity created by Prudencio's conduct as to the van crew's employment status, is supported by substantial evidence.

The record shows that both Prudencio and Torres heard Vazquez-Lozano's statement that the van crew should not sign any timesheets, and despite the clear

implication of this statement that the crew was not leaving voluntarily, neither Prudencio, nor Torres, spoke up to assure Vazquez-Lozano and her crew that they had not been terminated.[10]  (See *Duquesne Electric and Manufacturing Co*. (1974) 212 NLRB 142, 145 [employee's statement, within earshot of company owner and supervisors, that she and her coworkers had been fired, provided "clear notice" of the employee's apparent interpretation of the owner's recent remarks to her and fellow employees, triggering employer's duty to clarify].)

While Torres approached the van after Vazquez-Lozano and her crew had boarded it, asking them to wait and speak to her, she did not specify the purpose for which she wanted the crew to wait.  Moreover, when Vazquez-Lozano eventually spoke to Torres to ask for the telephone number of a labor union or the Labor Commissioner, indicating she believed the van crew had been unfairly terminated, Torres simply responded she did not have the requested information.  Torres did not take the opportunity to clarify to either Vazquez-Lozano as the driver of the group, or to the group as a whole, that the van crew had not been terminated.[11]

III.    **Wonderful's Procedural Due Process Arguments**

Wonderful asserts, for the first time on appeal, a number of procedural objections to the hearing in this matter.  Wonderful argues that it was denied procedural due process because, prior to the hearing, the ALRB's General Counsel maintained the position that multiple employees complained about the pace of work, but at the hearing, the General Counsel changed her theory and argued instead that only Vazquez-Lozano complained.

---

[10]    The ALJ discredited, after careful analysis of its credibility, Torres's testimony, uncorroborated by Prudencio, to the effect that Prudencio had said that no one was fired; the ALJ found that Torres's "overly analytical" testimony "defie[d] credulity."

[11]    Torres indicated that she spoke separately to one member of the van crew and told her she could stay and work.  Given the group context of the discharge, the ALJ did not find this evidence relevant; the Board agreed and noted that, even assuming the interaction occurred, neither Vazquez-Lozano, as the driver for the group, nor the group as a whole, received any clarification as to their employment status.

Wonderful further argues that it was denied due process because the General Counsel stated at the pre-hearing conference that she intended to call four worker-witnesses but only called Vazquez-Lozano and Hernandez. Finally, Wonderful asserts that the hearing was procedurally defective because the Spanish-language interpreter allegedly had "side conversations" with witnesses, the ALJ allegedly construed the Spanish word "corriendo" favorably to the General Counsel,[12] and the ALJ was biased in making credibility determinations.

Wonderful did not raise these issues during the administrative proceedings and is precluded from asserting them for the first time on appeal. Wonderful made no objection or argument at the hearing, in its post-hearing brief, or in its exceptions to the ALJ's decision to the effect that the General Counsel purportedly altered her legal theory. Likewise, when the General Counsel rested her case after calling two witnesses, Wonderful did not object or request a continuance or any other relief. Wonderful did not raise the issue in its post-hearing brief, nor did it file an exception on the issue. With respect to the language interpretation and bias issues, Wonderful did not object to any "side conversations" during the hearing or to the ALJ's handling of the translation of the word "corriendo," and nor did Wonderful raise these issues in its exceptions. Wonderful has therefore not preserved these issues for appellate review. (*Lindeleaf v. ALRB* (1986) 41 Cal.3d 861, 869-870 [claim that party was improperly denied a hearing was waived on appeal where it was not raised before the ALRB); *Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, 892, fn. 6 ["due process and bias issues must be presented to the hearing officer or tribunal itself for the issue to be preserved"]; *Niles Freeman Equipment v. Joseph* (2008) 161 Cal.App.4th 765, 788 [party's due process claims were not preserved on appeal because they were not raised during administrative proceedings];

---

**12** At various points in her testimony, Vazquez-Lozano used the Spanish word "corriendo" to describe the van crew's ejection from the worksite. The Spanish interpreter stated that the word could be translated as "kicked out" or as "fired."

22.

*People v. Romero* (2008) 44 Cal.4th 386, 411 [party precluded from asserting errors on appeal related to interpreter's conduct, where there was no objection below]; *People v. Aranda* (1986) 186 Cal.App.3d 230, 237 ["When no objection is raised to the competence of the interpreter during trial, the issue cannot be raised on appeal"].)  Furthermore, we are persuaded that Wonderful's due process arguments are without merit.

## IV.  Remedy Ordered by the Board

### A.  Reinstatement Remedy

As noted, the Board adopted the ALJ's conclusion that Wonderful discharged the van crew in violation of section 1153, subdivision (a) of the ALRA and thereby committed an unfair labor practice.  As part of its remedy for the unlawful discharge of the van crew, the Board ordered that Wonderful make an offer of reinstatement, which is an established part of the standard remedy for unlawful discharges.  (*Sandhu Brothers Poultry and Farming*, *supra*, 40 ALRB No. 12, p. 27 [reinstatement is part of the standard remedy for unlawful discharge]; *Phelps Dodge Corp. v. NLRB* (1941) 313 U.S. 177, 187 ["Reinstatement is the conventional correction for discriminatory discharges."].) Wonderful argues the Board should have omitted this aspect of the remedy because Prudencio's supervisor, Alavez, had already offered to reinstate the crew.  However, the Board explicitly stated that, to the extent that Alavez made a valid offer of reinstatement, the Board's order did not require Wonderful to make a second offer and Alavez's offer would operate to limit Wonderful's backpay liability.  The Board noted that the matter would properly be addressed at the compliance stage.  Accordingly, there are no grounds to find the Board's reinstatement remedy to be overbroad or punitive.

### B.  Company-Wide Notice Reading Remedy

Wonderful argues that the Board's notice-reading remedy was overbroad, as there was no evidence that employees other than the members of the van crew were aware of the unlawful terminations or were impacted by them.  The Board addressed Wonderful's concerns in this regard in detail and determined that "the noticing remedies recommended

23.

by the ALJ are justified and consistent with Board precedent." On appeal, Wonderful acknowledges that notice reading is an ordinary part of the remedy for unlawful terminations but suggests this matter is not ordinary, rendering the notice-reading remedy unwarranted. However, Wonderful has not shown that standard company-wide noticing falls outside the Board's admittedly broad remedial discretion in this instance. (*Oasis Ranch Management, Inc*. (1992) 18 ALRB No. 11, p. 38 ["extension of the remedy to all of Respondent's employees reflect[s] the Board's normal practice"]; *Diepersloot* (2018) 44 ALRB No. 12, pp. 10-14 [ordering notice to all employees as a remedy where employer threatened, terminated, and refused to rehire a single employee]; *Sandhu Brothers Poultry and Farming*, *supra*, 40 ALRB No. 12, pp. 40-44 [ordering notice to all employees as a remedy where employer terminated one employee who engaged in protected activity]; *P&M Vanderpoel Dairy*, *supra*, 40 ALRB No. 8, pp. 24-27 [ordering notice to all employees as a remedy where employer terminated five employees for engaging in protected concerted activity].) We detect no grounds to disturb the Board's remedial order.

## DISPOSITION

Wonderful's petition for writ of review is denied. The Board's order in *Wonderful Orchards, LLC* (2020) 46 ALRB No. 2 is affirmed. The Board and Imelda Vazquez-Lozano are awarded their costs in this original proceeding. (Cal. Rules of Court, rule 8.493(a)(1)(B).)

SMITH, J.

WE CONCUR:


FRANSON, Acting P. J.


PEÑA, J.

24.